<u>LEASE AGREEMENT</u>

THIS LEASE AGREEMENT (hereinafter "Lease") is entered into effective the 1st day of July 2017, by and between New Covenant Foundation, Inc. ("Landlord") and Bluepoint Medical Associates, LLC ("Tenant").

1) Premises. Upon and subject to the terms and provisions set forth herein, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises located at 6128 Brandon Ave. #208 and #210, Springfield, VA together with all improvements located thereon containing approximately 2878 gross square feet (hereinafter the "Premises")

2) <u>Term:</u>
   a) The term of this Lease shall commence on July 1st, 2017, (hereinafter "Lease Commencement Date") and end at midnight on June 30, 2020 ("Expiration Date". Tenant agrees to take the Premises in AS IS condition as of the Lease Commencement Date, and acknowledges that Landlord makes no representations or warranties regarding the condition of the Premises or the fitness of the Premises for Tenant's intended use. Notwithstanding the foregoing, on the Lease Commencement Date, Landlord shall deliver the Premises to Tenant with all electrical, mechanical and plumbing systems in good working order.

3) <u>Rent:</u>

   a) <u>Base Rent</u>. Commencing on July 1st, 2017, (the "Rent Commencement Date"), Tenant shall pay Landlord an initial base rent equal to **$4,501.67** per month in the sum of **$54,020.04** per year (the "Base Rent"), $18.77 per square foot. This introductory rate is valid for only the first 12 months of the lease after which the base lease shall increase by (3%) three percent over the Base Rent in effect for the prior twelve-month period

   | Lease Year | Annual Base Rent | Monthly Installments of Annual Base Rent |
   |---|---|---|
   | 1 | $ 54,020.04 | $ 4,501.67 |
   | 2 | $ 55,640.64 | $ 4,636.72 |
   | 3 | $ 57,309.84 | $ 4,775.82 |

   b) Security Deposit in the amount of $9,003.34 required hereunder to be paid to Landlord upon the execution of the Lease.

   c) All sums of money or charges required to be paid by Tenant under this Lease other than Base Rent, including, but not limited to, real estate taxes and condominium fees, as set forth in Section 3(c) hereof, shall be deemed Additional Rent hereunder and all remedies applicable to the non-payment of Base Rent shall be applicable thereto. For the purposes of this Lease, "Rent" shall be deemed to include Base Rent and Additional Rent. All such rent payments are due on the 5th day of each calendar month of the term hereof, in advance, without demand and without any deduction or set-off whatsoever. Until such time as Landlord provides Tenant with written notice as to other payment arrangements, all rent payments shall be direct deposited on the Landlord checking account within five (5) days receipt of such banking information from Landlord.

   d) <u>Additional Rent – Real Estate Taxes</u>. $0.00 are included in the base Rent. This Lease is a Triple Net Lease. Tenant shall pay property taxes as additional rent effective July 1st 2017.

   e) <u>Additional Rent - Condominium Fees</u>. $0.00 are included in the base Rent. This Lease is a Triple Net Lease. Tenant shall pay condominium fees as additional rent effective on June 1st, 2017.

4) <u>Use and Care of the Premises.</u>

    *a)* Tenant shall use the Premises for the operation as a professional office/Medical, and shall not use or permit the Premises to be used for any other purpose without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. Tenant's use of the Premises shall comply with all applicable zoning regulations and all other laws.

    b) Tenant shall be solely responsible, at Tenant's sole cost, for the prompt disposal and removal of all Medical Waste (as hereinafter defined) from the Premises so as to protect waste handlers and the public from exposure, and such disposal and removal shall comply with the requirements of all applicable laws.

    c) Tenant shall not use or allow the Premises to be used for any improper, immoral, unlawful or objectionable purpose, nor shall Tenant cause, maintain or permit any nuisance in, or about the Premises. Tenant shall not commit or suffer to be committed any waste in or about the Premises.

5) <u>Compliance with Law</u>. Tenant shall not use the Premises or permit anything to be done in or about the Premises which will in any way conflict with, or violate, any law, statute ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated; Tenant shall, at its own cost and, expense, promptly comply with all laws, statutes, ordinances and governmental rules and regulations now in force or which may hereafter be in force relating to, or affecting the condition, use or occupancy of the Premises, excluding structural changes not related to or affected by Tenant's improvements or acts,

6) <u>Hazardous Substances</u>. Tenant shall not cause or permit any Hazardous Substance (as herein defined) to be used, stored, generated, or disposed of on or in any portion of the Premises by Tenant or anyone under the express control of Tenant in violation of applicable laws without first obtaining Landlord's written consent, which consent may be withheld by Landlord in its sole and absolute discretion. Notwithstanding the foregoing, Tenant shall have

    a) the right to use such Hazardous Substances only in containers and quantities reasonably necessary for and consistent with the permitted use, and in compliance with all applicable laws and consistent with standard medical practices. If Hazardous Substances are used, stored, generated, or disposed of on or in the Premises, or if the Premises or any portion thereof become contaminated in any manner for which Tenant caused the release, Tenant shall indemnify and hold harmless the Landlord from any and all claims, damages, fines, judgments, penalties, costs, expenses, liabilities, or losses (including, without limitation, a decrease in value of the Premises, damages caused by loss or restriction of rentable or usable space, or any damages caused by adverse impact on marketing of the Premises, and any and all sums paid for settlement of claims, attorney's fees, consultant and expert fees) arising during or after the term of this Lease and arising as a result of Tenant's violation of the Lease. This indemnification includes, without limitation, any and all costs incurred because of any investigation of the site or any cleanup, removal, or restoration mandated by a federal state or local agency or political subdivision. Without limitation of the foregoing,

if Tenant causes or permits the presence of any Hazardous Substance in the Premises in violation of this Lease, Tenant shall promptly at is sole expense, take any and all necessary action to return the Premises to the condition existing prior to the presence of any such Hazardous Substance in the Premises. Tenant shall first obtain Landlord's

i) approval for any such remedial action. Tenant's obligations and liabilities under this section shall survive the expiration of this Lease. A Hazardous Substance means and includes any substance that is toxic, ignitable, reactive or corrosive and is regulated by any local government, the Commonwealth of Virginia, or the United States Government. A Hazardous Substance includes any and all material or substances that are defined as a hazardous waste, extremely hazardous waste, or a hazardous substance, pursuant to a federal, state or local government law.

7) <u>Alterations</u>. Tenant shall not make any alterations, additions or improvements to or of the Premises or any part thereof without the written consent of Landlord, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant shall not be required to obtain Landlord's consent for repainting, recarpeting, or other alterations, tenant improvements, or physical additions to the Premises which are cosmetic in nature totaling less than $5,000 in any single instance, in each case provided that (a) Tenant delivers to Landlord written notice thereof and any plans and specifications therefor prior to commencing any such alterations, additions, or improvements (for informational purposes only) and (b) such alterations, additions and improvements will not affect the building structure or the building's systems, or the appearance of the building's common areas or the exterior of the Premises. In the event Landlord consents to the making of any alterations, additions or improvements to the premises by the Tenant, any contractor or person selected by the Tenant must first be approved of in writing by the Landlord, said approval not to be unreasonably withheld. Tenant shall, at its own cost and expense, procure all necessary governmental permits and authorizations required for any such alterations, etc. Any alteration, addition or improvement to the Premises shall be in compliance with all applicable permits and authorizations and building and zoning laws. The costs of any such change, addition, removal or alteration shall be paid for by Tenant, so that the Premises shall at all times be free of liens for labor and materials supplied to the Premises. Tenant shall keep the Premises and the property in which Premises are situated free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant. Tenant shall be allowed to install Sinks in any and all rooms as it desires.

8) Mechanic's Liens.    In the event that any mechanic's lien is filed against the Premises as a result of any services or labor provided, or materials furnished, by or on Tenant's behalf, or claimed to have been provided by or on Tenant's behalf, Tenant shall upon written notice of the filing of such lien (i) immediately notify Landlord of such lien, and (ii) within twenty (20) calendar days after discharge and cancel such lien of record, by payment or bonding in accordance with the laws of the Commonwealth of Virginia, all at Tenant's sole cost and expense.

9) Insurance Covering Tenant's Work. Tenant shall not make any Alterations, or perform any other work to or on the Premises, unless prior to the commencement of such work, Tenant shall obtain (and during the performance of such work keep in force) public liability, worker's compensation, builder's risk (if applicable) and contractor's liability insurance to cover every contractor to be employed.  Such policies shall name Landlord as an additional

insured, shall be non-cancelable without thirty (30) days' prior written notice to Landlord and shall be issued by insurance companies reasonably satisfactory to Landlord. Prior to the commencement of such work, Tenant shall deliver a certificate of evidence of such insurance policies to Landlord.

10) <u>Maintenance and Repairs.</u>

a) Tenant shall be obligated to maintain or to make repairs, replacements, or improvements to the Premises. Tenant shall, at Tenant's expense, during the term of this Lease, maintain in good condition and repair the roof, foundation, structure, exterior walls and doors, and the underground utilities of and serving the Premises, and shall pay all costs related thereto, except if the need for said repair was caused by the negligence or willful misconduct of Tenant or anyone under the express control of Tenant, in which event the Tenant shall be liable for the costs and expenses incurred by Landlord for such repair. With regard to the common areas serving the building in which the Premises are a part, Tenant assumes full responsibility for compliance with Title I I I of the Americans with Disabilities Act (the "ADA"), which mandates nondiscrimination on the basis of disability by public accommodations and in commercial facilities.

b) Tenant, at its sole cost and expense, shall be responsible to keep the Premises and every part thereof in good condition. Tenant shall upon the termination of this Lease, surrender the Premises to the Landlord in its original condition, ordinary wear and tear excepted. During the term of this Lease Landlord has no obligation whatsoever to alter, remodel, improve, repair, replace, decorate or paint the Premises or any part thereof and the parties affirm that Landlord has made no representations to Tenant respecting the condition of the Premises except as specifically set forth in this Lease. Tenant, at Tenant's sole cost and expense, shall be responsible for the maintenance and repair of the Premises, and Tenant shall promptly repair, at Tenant's expense, any damage to the Premises or any equipment therein and will make all replacement thereto, whether such repairs be necessitated by ordinary wear and tear or other event of any kind. Without limiting the generality of the foregoing, Tenant's maintenance, repair, and replacement responsibilities shall include (each, a "System" and collectively, the "Systems"): (i) maintaining, operating and repairing all service pipes, electric, gas and water lines, and sewer mains servicing the Premises; (ii) maintaining, operating, repairing and replacing the fire protection and sprinkler systems; (iii) the cost of any improvements or alterations to the Premises which are required pursuant to any governmental law or regulation that was not applicable to the Premises at the time it was constructed resulting solely from Tenant's specific use of the Premises but not otherwise; (iv) all doors, including overhead doors, windows, loading docks and storage systems, if any, and (v) all electrical, mechanical, plumbing, heating, ventilating, air conditioning, and security systems, if any, presently or hereafter installed in the Premises, serving solely the Premises. Tenant shall only use contractors approved by Landlord for such maintenance and repairs. Except in connection with Landlord's gross negligence or willful misconduct, there shall be no abatement of Rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Premises or in or to any fixtures, appurtenances or equipment. Tenant waives the right to

make repairs at Landlord's expense under any law, statute or ordinance now or hereafter in effect. Notwithstanding the foregoing, in the event that any System requires replacement during the term of the Lease and the useful life of the system replaced exceeds the time period remaining under the term of the Lease, Landlord and Tenant shall apportion the total cost of each such System replacement (including total acquisition costs for any system installation and all other costs and fees associated with replacement) as follows: (a) Tenant shall pay for the portion of the total cost of any System replacement as a percentage equal to the remaining balance of the term of the Lease divided by the total useful life of the replaced System, said useful life for each system to be determined by its manufacturer, as amortized over the remaining balance of the term of the Lease and paid by Tenant as additional rent hereunder and (b) Landlord shall pay for the balance of the total cost of the System replacement.

11) <u>Assignment and Subletting</u>.
   a) Tenant shall not assign or transfer this Lease, and shall not sublet the said Premises or any part thereof, or any right or privilege appurtenant, or allow any other person to occupy or use the Premises or any portion, without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld. Landlord's consent to one assignment, subletting, occupation or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under this Lease. Landlord shall, in writing, give its consent or notify the Tenant of its refusal to consent to any proposed sublease or assignment within five (5) days of Landlord's receipt of Tenant's written request to sublease or assign and all information required by Landlord as set forth herein. Notwithstanding the foregoing restrictions, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublet the Premises, in whole or in part, to (i) to any parent, subsidiary or affiliate of Tenant or any entity which owns an interest in Tenant or does business with Tenant, or (ii) any firm, person, corporation, partnership or other entity resulting from a merger or the sale of all or substantially all of the ownership interests or assets of Tenant (each, a "Permitted Transfer"). Said Permitted Transfer shall not be deemed to relieve the Tenant from its obligations under this Lease. Tenant shall provide prompt written notice of any Permitted Transfer. Landlord acknowledges and agrees that Tenant intends to make the Premises available for use by Bluepoint Medical Associates, Blue point Wellness and Bluepoint Holding and Landlord consents to the Doctor Group's use of the Premises whether by license, sublease or otherwise, subject to the Doctor Group's compliance with all terms and conditions of this Lease.

12) <u>Insurance.</u>
   a) <u>Liability Insurance</u>. Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect at all times during the Term of this Lease, a policy of comprehensive general public liability insurance with broad form property damage endorsement, naming Landlord and (at Landlord's request) any mortgagee of the Premises as additional named insured, protecting Landlord, Tenant and any such mortgagee against any liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, with such policy to afford protection to the limit of not less than $1,000,000.00 with respect to bodily injury, personal injury or death to any one person, to a limit of not less than $2,000,000.00 with respect to bodily injury, personal injury or death to any number of persons in any one occurrence, and to the limit of not

less than $1,000,000.00 with respect to damage to the property of any one owner.

b) <u>Property Insurance.</u>    Landlord agrees to procure and maintain a broad form all-risk fire and extended casualty insurance policy covering the Premises and all appurtenances thereto, but excluding any Tenant improvements constructed by Tenant or Landlord, in an amount equal to the current replacement cost, with extended coverage endorsement. To the extend coverage is sufficient, a policy maintained by the condominium Owner's Association shall suffice.

c) The insurance policies required to be obtained by Tenant under this Lease (i) shall be issued by an insurance company approved by Landlord in its reasonable discretion which is licensed to transact business in Virginia, and (ii) shall be written as primary policy coverage and not contributing with or in excess of any coverage which Landlord may carry. With respect to the insurance policies required to be obtained by Tenant under this Lease, on or before the Lease Commencement Date, and at least thirty (30) days prior to the expiration of the expiring policy or certificate previously furnished, Tenant shall deliver to Landlord a Certificate of Insurance therefore. The insurance policies required to be carried hereunder by or on behalf of Tenant shall provide (and any certificate evidencing the existence of such insurance policies shall certify) that such insurance policies shall not be canceled unless Landlord shall have received thirty (30) days prior written notice of cancellation. Tenant shall require its insurer(s) to include in all of Tenant's insurance policies which could give rise to a right of subrogation against Landlord a clause or endorsement whereby the insurer(s) shall waive any rights of subrogation against Landlord.

d) Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or of defects in any fixtures or equipment in the Premises discovered by Tenant.

13) <u>Services and Utilities.</u>

a) Tenant shall promptly pay directly to the appropriate utility company all bills for electricity, telephone, internet, and television used in the Premises. If any portion or all of Tenant's equipment shall require electricity consumption in excess of the capacity of the electrical system installed by Landlord in the Premises, all additional transformers, distribution panels and wiring that may be required to provide the amount of electricity required for Tenant's equipment shall be installed by Landlord at the cost and expense of Tenant. Tenant shall not install any equipment of any kind or nature whatsoever that will or may necessitate any changes, replacements or additions to, or in the use of, the water system, heating system, plumbing system, air conditioning system, or electrical system of the Premises, without first obtaining the prior written consent of Landlord.

b) Tenant shall maintain a level of heat in the Premises which shall insure that the pipes and plumbing fixtures will not freeze and break, and Tenant shall be responsible for any repairs and replacements to said pipes and fixtures and any damage to the Premises and any personal property arising from freezing pipes and fixtures.

c) Failure by Tenant to any extent to furnish the above described services, or any cessation thereof, shall not render Tenant liable for damages to either person or property, nor be construed as an eviction of Tenant, nor work as an abatement of Rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof. Notwithstanding the foregoing, in

the event of any failure to furnish, or any stoppage of, the "Critical Services" (as hereinafter defined) for a period in excess of five (5) consecutive business days, and if (a) such interruption is restricted to the Premises and is not a neighborhood blackout; and (b) such failure to furnish or stoppage is caused by the negligence or willful misconduct of Landlord or by the failure of Landlord to commence and diligently pursue repairs for which Landlord is responsible under this Lease, Tenant shall be entitled to an abatement of Rent which shall commence on the sixth (6th) business day (and shall not be retroactive) and shall continue for the remainder of the period of such failure to furnish or stoppage of such specified services. As used in this Section 9, The "Critical Services" are electricity, heating, ventilating and air conditioning, and water. If any failure or interruption of service is due to a fire or other casualty, or is caused by Tenant, the remedies provide for in this Section shall not apply.

d) Tenant shall be responsible to contract with a janitorial company for cleaning of the Premises, at its expense. Tenant, at its sole expense, shall arrange nd pay all costs of and charges telephone, internet, and cable services provided to, used by or consumed on the Premises by Tenant.

14) Entry by Landlord. Landlord reserves and shall at any and all times have the right to enter the Premises with at least 24 hours prior notice, inspect the same, and show said Premises to prospective purchasers or tenants (but only during the 180-day period prior to the Expiration Date of the Lease Term, to repair the Premises, and to alter, improve or repair any portion of the Premises that Landlord may deem necessary or desirable. For emergency repairs, Landlord shall at all times have and retain a key with which to unlock all of the doors in, upon and about the Premises, excluding Tenant's vaults, safes and files, and Landlord shall have the right to use any and all means which Landlord may deem proper to open said doors in an emergency in order to obtain entry to the Premises without liability to Tenant. Except to exercise due care for Tenant's property. Landlord shall not be required to provide notice prior to entering the Premises when an emergency exists and requires immediate attention. Any entry to the Premises obtained by Landlord by any of these means, shall not be construed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction of Tenant from the Premises or any portion thereof. Landlord acknowledges that Tenant is subject to the provisions of the Health Insurance Portability and Accountability Act of 1996 and related regulations ("HIPAA"), and that HIPAA requires Tenant to ensure the safety and confidentiality of patient medical records. Landlord further acknowledges that, in order for Tenant to comply with HIPAA, Tenant must restrict access to the portions of the Premises where patient medical records are kept or stored.   Landlord   hereby   agrees   that, notwithstanding  the rights granted  to Landlord  under this Section  15, except  for  an emergency entry into the Premises or when accompanied by an authorized representative of Tenant, when possible, neither Landlord nor its employees, agents, representatives or contractors shall be permitted to enter those areas of the Premises designated by Tenant as locations where patient medical records are kept and/or stored, or in any patient examination rooms when occupied by a patient.

15) Damage to Premises.

a) If the Premises shall be partially damaged by fire or other cause without the fault or neglect of Tenant, this Lease shall not be terminated and Landlord shall proceed with diligence, subject to the then applicable statutes, building codes, zoning ordinances,

and regulations of any governmental authority, and as soon as practicable after such damage occurs, to repair such damage, at the expense of Landlord, to the extent of insurance proceeds made available to Landlord (taking into account the time necessary to effectuate a satisfactory settlement with any insurance company involved and for such other delays as may result from government restrictions, controls on construction, if any, and strikes, emergencies and other conditions beyond the control of the parties); provided however, that if the Premises are damaged by fire or other cause to such extent that the damage cannot be fully repaired within one hundred eighty (180) days from the date of the casualty, either Tenant or Landlord, upon written notice to the other, may terminate this Lease, in which event the Rent shall be apportioned and paid to the date of such damage. During the period that Tenant is deprived of the use of the damaged portion of the Premises, Tenant shall be required to pay Rent covering only that part of the Premises that Tenant is able to occupy, and the Rent for such space shall be that portion of the total Rent which the amount of the gross square feet of the Premises remaining that can be occupied by Tenant bears to the total gross square feet of the Premises. Such abatement shall terminate thirty (30) days after the date any such repair and restoration work is substantially completed by Landlord and the Premises are delivered to Tenant. In no event shall Landlord be obligated to repair or replace Tenant's improvements, fixtures, equipment, or personality. Subject to the termination provisions of this Section, Tenant shall promptly commence and diligently pursue to completion the redecorating and refixturing of the Premises, including repairing, restoring or replacing Tenant's personal property and any Alterations to the Premises made by Tenant. If such damage is caused by the fault or neglect of Tenant, or anyone under the express control of Tenant, or if Landlord or any lender with a security interest in the Premises shall be unable to collect the insurance proceeds applicable to such damage because of some willful action or inaction on the part of Tenant, or anyone under the express control of Tenant, such damage shall be repaired promptly, at Tenant's sole cost and expense, either by Landlord or, at Landlord's option, by Tenant subject to Landlord's direction and supervision, and there shall be no abatement of Rent. Landlord shall not be liable to delays in making of such repairs which are due to government regulation, casualties, strikes, unavailability of labor and materials, and other causes beyond the reasonable control of Landlord. If Landlord commences to complete such restoration, and such repairs are not completed within two hundred ten (21 0) days after the date of the casualty (the "Restoration Period"), then Tenant may at its option terminate this Lease by written notice to Landlord within thirty (30) days of the expiration of the Restoration Period; provided, however, that if construction or reconstruction is delayed because of changes, deletions or additions in construction requested by Tenant, the period for restoration shall be extended for the amount of time Landlord is so delayed.

    b) Other than an abatement of Rent for the period of time Tenant is unable to use the Premises, Tenant shall not be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises, or any inconvenience or annoyance occasioned by damage, repair, reconstruction or restoration.

16) Condominium Association. Landlord will provide Tenant with copy of the condominium Association. Tenant agrees to abide by all applicable rules of the Condominium Association and agrees to indemnify Landlord in the event that action is ever taken against Landlord due solely to actions of Tenant.

17) Default. The occurrence of any one or more of the following events shall constitute a Default

and breach of this Lease by Tenant:

a) The abandonment of the Premises by Tenant and Tenant ceases paying rent and performing its other obligations under this Lease.

b) The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant as and when due, where such failure shall continue for a period of five (5) days after written notice by Landlord to Tenant. No notice shall be required for failure to make any payment if the Tenant has previously received a notice of non-payment during the same calendar year.

c) The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by the Tenant, where such failure shall continue for a period of thirty (30) days after written notice by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, the Tenant shall not be deemed to be in default if Tenant commences such cure within five (5) days after receipt of written notice and thereafter diligently prosecutes such cure to completion within sixty (60) days from the receipt of the Landlord's notice, and in any event prior to the time a failure to cure such default could cause Landlord to be subject to prosecution for violation of any law, rule, ordinance or regulation, or causes, or could cause a default under any deed of trust or mortgage.

d) The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition in bankruptcy; or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within 120 days); or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to

18) Tenant within sixty (60) days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged in sixty (60) days.

19) Remedies. In the event of any such default or breach by Tenant, Landlord may at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

   a) Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to landlord. In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, reasonable attorneys' fees; the cost of recovering possession of the Premises; expenses of repairs including repair and alteration of the Premises; any brokerage fees; any defaulted rent or additional rent payments; the difference, if any, between the unpaid rent for the balance of the Lease term discounted to present value at a rate of 6% per annum, and the amount received by Landlord for any leasing of the Premises during the balance of the Lease term; that portion of the leasing commission paid by Landlord and applicable to the unexpired term of this Lease. Unpaid installments of rent or other sums shall bear interest from the date due at the rate of twelve percent (12%) per annum or the highest rate permitted by applicable law;

   b) Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event Tenant shall continue to be liable for all rent, additional rent and all other charges due under this Lease, in addition to all costs (including reasonable attorneys' fees) and other damages arising from Tenant's default; or

   c) Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decision of the Commonwealth of Virginia.

   d) Tenant waives all rights of redemption granted by law. This means that once Tenant has committed a default and failed to cure that default within any cure period provided by this Lease, Tenant waives all rights under law to later cure the default and reclaim its interest in this Lease or the Premises. Notwithstanding anything in this Lease to the contrary, Landlord agrees to use commercially reasonable and diligent efforts to mitigate damages resulting from a Tenant event of default. Further, Landlord hereby waives all claims to punitive, indirect or consequential damages.

20) Landlord May Perform Tenant's Obligations. If Tenant shall fail to keep or perform any of its obligations as provided in this Lease in respect to (i) maintenance of insurance, (ii) repairs and maintenance of the Premises or (iii) the making of any other payment or performance of any other obligation, then Landlord may (but shall not be obligated to do so) upon the continuance of such failure on Tenant's part for ten (10) days after written notice to Tenant and without waiving or releasing Tenant from any obligation and as an additional but not exclusive remedy, make any such payment or perform any such obligation and all sums so paid by Landlord, together with interest thereon at the rate of

twelve percent (12%) per annum from the date of payment, shall be paid to Landlord upon demand.

21) <u>Landlord's Lien and Security Interest.</u> Landlord hereby waives any and all lien rights, whether statutory or common law or established pursuant to this Lease, that Landlord may have as "landlord" with respect to any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant presently or which may hereafter be situated within the Premises.

22) <u>Condemnation</u>. In the event that the whole or substantially the whole of the Premises are taken or condemned for any public purposes, this Lease and the leasehold estate created hereby shall cease and terminate as of the date of such taking. In the event that a portion, but less than substantially the whole, of the Premises should be taken or condemned for any public purpose, then Landlord shall have the option to terminate this Lease, effective as of the date specified by Landlord in its notice of termination, or, at Landlord's option, this Lease shall be terminated as of the date of such taking as to the portion of the Premises so taken and this Lease shall remain in full force and effect as to the remainder of the Premises. In such event, the Base Rent will be diminished by an amount representing the par to such rent properly applicable to the portion of the Premises so taken. All awards, damages, and other compensation paid by the condemning authority on account of such taking or condemnation (or sale under threat of such a taking) shall belong to landlord, and Tenant hereby assigns to landlord all rights to such awards, damages and compensation. Tenant agrees not to make any claim against Landlord or the condemning authority for any portion of such award or compensation attributable to damages to the Premises, the value of the unexpired term of this Lease, the loss of profits or goodwill, leasehold improvements, or severance damages.

23) Certificates. Tenant shall at any time and from time to time upon not less than ten (10) days prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified, is in full force and effect), and the date to which the rental and other charges are paid in advance, if any, and (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of the Landlord (or specifying such default if they are claims).

24) <u>Brokers</u>. Landlord and Tenant each warrant and represent to the other that there was no broker or agent on Landlord's or Tenant's behalf instrumental in consummating this Lease, and that no conversations or prior negotiations were had by Landlord or Tenant with any other broker or agent on Landlord's or Tenant's behalf concerning the renting of the Premises. Landlord and Tenant each agree to indemnify and hold the other harmless against any claims for brokerage or other commissions arising by reason of a breach by Landlord or Tenant of the        aforesaid representation and warranty.

25) <u>Legislative Modification.</u>  It is expressly recognized and understood by the parties to this Lease that Section  6204 of the Omnibus Budget Reconciliation  Act of 1989, as

amended (hereinafter referred to as the "Stark Law") specifically prohibits a physician from making a referral to a clinical laboratory (for which referral the Medicare and Medicaid Programs would otherwise pay) if the physician (or a member of the physician's immediate family) has a financial arrangement with such clinical laboratory. It is further recognized by the parties hereto that the self-referral prohibition of the Stark Law and any regulations so implementing the Stark Law will affect the parties hereto except to the extent the parties are otherwise specifically exempt from, or outside the scope of, the Stark Law and its regulations. Landlord and Tenant enter into this Lease with the intent of conducting their relationship and implementing the agreements contained herein in full compliance with applicable federal, state and local laws, including without limitation, the Medicare/Medicaid Anti-Kickback statute (the "Anti-Kickback Law") and Stark Law, as amended. Notwithstanding any unanticipated effect of any of the provisions of this Lease, neither party will conduct itself under the terms of this Lease in a manner that would constitute a violation of the Anti-Kickback Law or the Stark Law. If at any time either party fails to so comply with the provisions and exceptions of the Stark Law or Anti-Kickback Law, either party may terminate this Lease immediately provided, however, that the parties shall have five (5) days from the date either party discovers that it has unintentionally violated this provision to conform the Lease with the "leased space" exception of the Stark Law. In connection with the forgoing, Landlord covenants and acknowledges that at least one member/owner of the Landlord is a PHYSICIAN. Landlord covenants and agrees that Landlord shall notify Tenant within thirty (30) days of any change in the facts relating to this certification.

26) Renewal Option. If(i) no event of Default shall exist as of the date of delivery of an Exercise Notice (as defined below) or the commencement date of the applicable Option Term (as defined below), and (ii) Tenant originally named herein or its Permitted Transferee remains in possession of the Premises, Tenant has the right to extend the term of this Lease for ONE additional period of three (3) years (an "Option Term") upon the immediate expiration of the then current term upon the same terms and conditions set forth in this Lease, by giving to the

27) Landlord written notice (an "Exercise Notice") not less than one hundred twenty (120) days prior to the expiration of the then current term of this Lease. If Tenant properly exercises the option to extend, Landlord and Tenant shall execute an amendment to this Lease reflecting the terms and conditions of the Option Term. The Base Rent Renewal term shall be determined in accord with section 3.a. of this Lease

28) General Provisions:Waiver.

a) Notices. All notices to be given with respect to this Lease shall be in writing and delivered in person or sent by registered or certified mail, or overnight delivery service, return receipt requested, first class postage prepaid, (i) if to Tenant at:

29) Or to such other place as Landlord may from time to time designate in a written notice to the Tenant. Such notices, if sent by registered or certified mail, or overnight delivery shall be deemed to have been given when delivered or, if delivery is refused, then upon such refusal. Notice from an attorney or agent acting or purnorting to act on behalf of a party

shall be deemed notice from such party if such attorney or agent is authorized to act on behalf of such party.

a) <u>Marginal Headings</u>. The marginal headings and section titles to the sections of this Lease are not a part of this Lease and have no effect upon the construction or Interpretation of any part of the Lease.

b) <u>Gender</u>. The terms and words used herein regardless of the number and gender specifically used shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context of this Lease may require.

(i) Counterparts. This Lease may be executed in two (2) or more duplicate counterparts and upon execution of a counterpart by both parties each counterpart shall constitute an original executed copy of this Lease. Notwithstanding the foregoing, all signatures attached to the Lease must be original and shall not be delivered by facsimile or electronic means.

(ii) <u>Late Charges</u>. Tenant acknowledges that late payment by Tenant to Landlord of rent or other sums due will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by terms of any mortgage or deed of trust covering the Premises. Accordingly, if any installment of Base Rent, Additional Rent or of any other sum due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days of when due, then Tenant shall pay to Landlord a late charge equal to ten percent (10%) of such overdue amount; provided, however, no interest shall be imposed on the first late payment in any twelve (12) month period unless such payment is not made within five (5) business days after Landlord delivers written notice of such late payment to Tenant. The parties agree that such late charge represents a fair and reasonable estimate of the cost that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charges by the Landlord shall in no event constitute a waiver of Tenant's default with respect to the overdue amount, nor prevent Landlord from exercising any other rights and remedies. Additionally, unpaid installments of Rent or other sums shall bear interest from the fifth day of the date due at the rate of ten percent (10%) per annum.

(iii) <u>Prior Agreements</u>. This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understanding pertaining to any such matters shall be effective for any purpose. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest. This Lease shall not be effective or binding on any party until fully executed by both parties.

(iv) <u>Attorneys' Fees</u>. In the event of litigation between the parties related to or arising from this Lease, the prevailing party shall be entitled to recovery of reasonable attorneys' fees and costs as fixed by the Court.

(v) <u>Subordination</u>. Upon request of the Landlord and Tenant's receipt of a subordination, non-disturbance agreement from any ground lessor or lender, Tenant will in writing subordinate its rights to the lien of an mortgages or deeds of trust, to any bank, insurance company or other lending institution, now or hereafter in force against the Premises and to all advances whenever made upon the security.

(vi) <u>Severability</u>. Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision of this Lease and such other provisions shall remain in full force and effect.

(vii) <u>Choice of Law and Forum</u>. This Lease shall be governed by the laws of the Commonwealth of Virginia, and any suit brought pursuant to this Lease shall be brought in the Courts of Fairfax County, Virginia.

(viii) <u>Cumulative Remedies</u>. No remedy or election shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed as of the day and year first above written.

LANDLORD:

New Covenant Foundation

By: _____

Title: Executive Director

Date: 6/29/2017

TENANT:

Bluepoint Medical Associates

By: _____

Title: CW / Managing Partner

Date: 6/27/2017